*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

BRIAN OGLE,

      Plaintiff-Appellant,

v

CHARTER TOWNSHIP OF MUNDY and
CHARTER TOWNSHIP OF MUNDY POLICE
DEPARTMENT,[1]

      Defendants-Appellees.

UNPUBLISHED
May 19, 2022

No.   357485
Genesee Circuit Court
LC No.   16-106781-CD

Before:  LETICA, P.J., and MARKEY and O'BRIEN, JJ.

PER CURIAM.

In this action brought under the Whistleblower Protection Act (WPA), MCL 15.361 *et seq.*, plaintiff appeals as of right the trial court order granting summary disposition in favor of defendants.  We affirm.

## I.  BASIC FACTS AND PROCEDURAL HISTORY

At approximately 1:20 a.m., on September 15, 2015, the female complainant was observed running half-naked through the parking lot of a Knights Inn motel.  The complainant was pursued by a man who dragged her back into a motel room.  The witness, Colleen Dowdall, an occupant of a neighboring motel room, notified the front desk clerk of her observations.  A short time later, the complainant was seen running through the parking lot wearing only underwear and screaming and crying for help.  The naked man again retrieved the female and dragged her back into a motel room.  After this second incident, Dowdall called 911 directly.  A short time later, the complainant

---

[1] Before the hearing on the dispositive motion, the parties stipulated to dismiss defendant, Charter Township of Mundy Police Department.  However, the order appealed from and appellees' brief on appeal continue to identify the police department as a defendant.

appeared at Dowdall's door wearing a shirt inside out and asked for help. As the complainant vomited in Dowdall's bathroom, the man got into his vehicle to leave the premises.

Plaintiff, a patrol officer, and his superior, Sergeant Todd Johnson, responded to the 911 call. Initially, the man tried to drive around the police, but they stopped him. It was learned that the man was a local resident, former college basketball star and National Basketball Association player Mateen Cleaves. Apparently, Cleaves and the complainant met earlier in the day at a charity fundraiser, and they both had consumed alcohol throughout the day and evening. According to the police, the complainant appeared to be intoxicated. Plaintiff alleged that both the complainant and Cleaves indicated that their interactions were consensual,[2] and therefore, probable cause of a crime was not present. Although plaintiff asserted that Cleaves did not smell of alcohol, he was offered a preliminary breath test (PBT), but declined it. Instead, Cleaves accepted the police offer to be driven home. Purportedly at her request, the complainant was left at the motel waiting for a ride home with the witnesses.[3] Neither plaintiff nor Johnson prepared a police report addressing the incident although it was recorded in their daily activity log.

Later on September 15, 2015, Deputy Chief Rick Clolinger was off-duty, but in the office to work on administrative matters. He was speaking with Johnson when plaintiff approached. Plaintiff advised that he received a call from a sexual assault nurse examiner (SANE) at Genesys Hospital that the complainant had come to the hospital for an examination, a rape kit had been prepared, and the complainant wanted to speak to an officer. Plaintiff asked Johnson what he should do. Clolinger "lost it." He instructed plaintiff to go to the hospital, take the report of the complainant, and secure the rape kit into evidence.

At the hospital, plaintiff encountered the complainant, her mother, and the SANE nurse. The women were appalled by plaintiff's demeanor and attitude. The complainant's mother reported that plaintiff entered the room with a flippant attitude, and it seemed like plaintiff would not record the complainant's statement in an objective manner. Plaintiff questioned the qualifications of the SANE nurse. Plaintiff repeatedly commented in a snide manner that the complainant was drunk and justified his failure to investigate Cleaves for operating while intoxicated (OWI). Plaintiff reportedly told the SANE nurse that a rape did not occur, that the complainant was drunk, that "none of this stuff happened," and that was why no one was arrested.

On October 9, 2015, the complainant's mother filed two citizen complaints with defendant police department. The first complaint objected to the officers' treatment of the complainant after she was assaulted at the motel. The complainant's mother questioned why the complainant was left with two strangers in a motel room while the complainant waited for a ride home, which potentially further jeopardized the complainant's safety. The second complaint objected to

---

[2] In his deposition, Johnson believed that the complainant responded to police questioning that she was "not assaulted." However, he also recalled that the complainant stated that she felt that she "did not have a choice."

[3] In addition to Dowdall, a man was seated in his vehicle when he observed the complainant running in the parking lot and pursued by Cleaves.

plaintiff's treatment toward the women at the hospital. Clolinger was assigned the task of addressing the citizen complaints. On October 13, 2015, Clolinger directed plaintiff to file a special report addressing the September 15, 2015 incident.

After the rape kit was collected, Detective Mike Neering was assigned to investigate the incident between Cleaves and the complainant.[4] The Genesee County Prosecutor's Office disqualified itself from handling the case, and the Wayne County Prosecutor's Office received the assignment. On November 13, 2015, plaintiff sent an e-mail to the lead prosecutor, Lisa Lindsey. In the e-mail, plaintiff volunteered that he was one of the responding officers, that no probable cause of a crime was found, that he was subjected to a "heightened level of scrutiny" since the incident, and that there was "tension" in the police department. Plaintiff received an investigative subpoena from Lindsey and was required to appear for a deposition. Ultimately, Cleaves was criminally charged by the Wayne County Prosecutor's Office, but acquitted following a jury trial.

In his investigation of the citizen complaints,[5] Clolinger determined that both plaintiff and Johnson committed multiple violations of defendant police department's rules and regulations. Specifically, both officers encountered Cleaves, who had been drinking all day and night, but failed to investigate him for OWI. Although the officers opined that Cleaves was not drunk, they offered to give Cleaves a PBT. After Cleaves declined the PBT, Johnson gave Cleaves a ride home. Moreover, Clolinger questioned why the officers did not deem the circumstances suspicious in light of the nature of the 911 call. The call reported the naked or semi-naked complainant running from a naked Cleaves and screaming out for help. The officers purportedly relied on the report from both parties that no act of assault occurred, and therefore, the officers determined that any intimate acts were consensual. Yet, Clolinger noted the complainant and Cleaves did not drive off together. The complainant chose to remain in a room with two strangers instead of leaving with Cleaves. Clolinger analogized the situation to a domestic-violence scenario where a man and woman deny any physical abuse, but the woman is found with a bruised eye and the man has a cut hand.

Additionally, it was concluded that plaintiff and Johnson violated police department policy by failing to prepare a report. The identity and statements of the witnesses were not documented. The officers did not determine if there were video cameras on the motel premises that recorded the incident. The motel room occupied by Cleaves was not examined for evidence. Also, plaintiff's conduct at the hospital was inappropriate. As a result of these shortcomings, Clolinger concluded that plaintiff failed to exhibit courtesy, failed to interview witnesses and gather evidence, and failed to prepare written reports. Clolinger admitted that he was angry with plaintiff for sending the e-mail to Lindsey because it was improper. Any communication to the prosecutor's office should have been through the lead detective, Neering. Additionally, the e-mail appeared to be self-serving

---

[4] Neering secured the names of the witnesses and took their statements, secured the videotape of the complainant running in the parking lot, secured the videotape of Cleaves' vehicle arriving and departing from the motel entrance on multiple occasions, interviewed other individuals who were present at the fundraiser, executed search warrants, and prepared reports.

[5] Clolinger's inquiry was limited to the citizen complaints, and he played no role in the criminal investigation of the night of September 15, 2015.

and advised of plaintiff's opinion that the investigation was a waste of time. Plaintiff was not placed under oath for the e-mail and could have presented his viewpoint during his deposition when he would have been duly sworn. Nonetheless, Clolinger did not impose any discipline on plaintiff for sending the e-mail. Although Clolinger recommended a 30-day suspension and training, Chief Dan Atkinson imposed a two-day suspension and training for plaintiff and Johnson.

Plaintiff's two-day suspension was not the only time that plaintiff had been disciplined. In 1997, plaintiff was hired by David Guigear, former township police chief, treasurer, and supervisor. Guigear recounted that in 2002, local bank employees called for police assistance believing that a robbery was in progress. However, a police officer was associating with a known felon, and the felon waved the officer's weapon, causing the confusion. Plaintiff responded to the incident, but he did not prepare a report. Guigear learned of the incident because bank employees were so dismayed by the incident that he was contacted directly.

Additionally, plaintiff's superiors and colleagues rated plaintiff in the "bottom tier" of police officers. Plaintiff was not deemed aggressive or a hard worker. His daily activity logs as a third-shift patrol officer reflected that he spent hours at the street upon which he lived. When plaintiff first met Clolinger before Clolinger started the job of deputy chief, plaintiff asked Clolinger for a "big favor," specifically a "buyout" so he could leave the police force. In 2012, plaintiff obtained a law degree and started a law practice that mostly involved criminal representation despite continuing his employment as a police officer. In 2015, plaintiff was advised to cease and desist the practice of criminal law or be fired from defendant police department. Plaintiff chose to close his practice. Although plaintiff asserted that he was wrongfully denied promotions or favorable assignments, it was opined by superiors and colleagues that there were more qualified and serious candidates. Indeed, plaintiff reportedly appeared for a job interview in shorts and a golf shirt while other applicants wore uniforms or suits. Plaintiff was disciplined on multiple occasions for failing to write a report even after the Cleaves incident.

Plaintiff objected to the two-day suspension imposed. He requested that the union file a grievance, but his request was declined because plaintiff filed this one-count WPA complaint. Plaintiff alleged that he was treated differently than Johnson because Johnson did not actually serve two unpaid days and Johnson's discipline was to be removed from his record. Plaintiff asserted that he engaged in protected activity by writing the e-mail to Lindsey and participated in the prosecutor's inquiry as required by the investigative subpoena. Plaintiff further claimed that he angered police department administration and township leaders by telling anyone who would listen that there was no probable cause to arrest Cleaves and that Cleaves was being framed.

Defendants moved for summary disposition under MCR 2.116(C)(10),[6] contending that plaintiff could not meet the elements or burden of proof for a WPA claim. Specifically, plaintiff could not show that he engaged in protected activity under the WPA, that he suffered adverse employment action, and that there was a causal connection between the protected activity and the adverse employment action. It was submitted that the e-mail to Lindsey could not constitute

---

[6] Defendants moved for the dismissal of defendant police department under MCR 2.116(C)(7), but the parties stipulated to the dismissal of this party before the motion was heard. Accordingly, we do not address that aspect of the dispositive motion.

-4-

protected activity because it did not allege a violation of law, regulation, or rule. Moreover, plaintiff's personal belief that there was no probable cause to arrest and that expression to superiors was irrelevant because prosecutors were responsible for issuing criminal charges. Indeed, as an attorney, plaintiff recognized that it was the role of the prosecutor to make charging decisions. It was also alleged that plaintiff could not demonstrate a causal link between any alleged protected activity and the adverse employment action comprised of a two-day suspension. Rather, plaintiff incurred legitimate adverse employment action for failing to interview witnesses, failing to report an incident, and failing to conduct himself appropriately. The discipline imposed was consistent with plaintiff's history of discipline and his actions and reputation as a "bottom tier" officer.[7]

Plaintiff opposed the dispositive motion, asserting that he investigated the Cleaves matter and determined that any acts were consensual and no factors supported probable cause. After reporting his good faith belief to his supervisors, plaintiff claimed that they violated the law by their pressure to "frame" Cleaves. Therefore, plaintiff reported suspected violations of law. Plaintiff also e-mailed and testified at a deposition for the investigating prosecutor's office. This participation in an investigation supported plaintiff's whistleblowing activity. Viewing this evidence in the light most favorable to plaintiff, he submitted there were genuine issues of material fact that precluded summary disposition.

The trial court heard oral argument and granted defendants' motion for summary disposition. The trial court concluded that the e-mail plaintiff sent to Lindsey did not constitute protected activity for purposes of the WPA. However, the court further questioned whether plaintiff's conveyance of his concerns to his superiors constituted protected activity. It was determined that the issue of protected activity did not need to be resolved. Instead, the trial court *assumed* that the protected activity requirement was satisfied. And the trial court held that plaintiff could not establish a prima facie case because the causal connection element was not fulfilled when there were legitimate reasons for the suspension that were performance based. From this decision, plaintiff appeals.

## II. STANDARD OF REVIEW

A trial court's ruling on a motion for summary disposition is reviewed de novo. *Houston v Mint Group, LLC*, 335 Mich App 545, 557; 968 NW2d 9 (2021). Summary disposition is appropriate pursuant to MCR 2.116(C)(10) where there is "no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." MCR 2.116(C)(10). When reviewing a motion for summary disposition challenged under MCR 2.116(C)(10), the court considers the affidavits, pleadings, depositions, admissions, and other admissible documentary evidence then filed in the action or submitted by the parties in the

---

[7] Defendants also cited to the fact that Johnson received the same two-day suspension. Plaintiff alleged that Johnson admitted that he did not serve the two-day suspension. But, unlike plaintiff, Johnson decided to accept the two-day suspension. And Johnson's union representation was able to negotiate the discipline imposed and that it would be removed from his record if he did not incur additional discipline within a specific time period. Plaintiff chose to pursue this litigation instead of negotiating a reduction through union representation. Plaintiff's reliance on Johnson's disposition cannot be equated with plaintiff's circumstances in light of these facts.

light most favorable to the nonmoving party. MCR 2.116(G)(4), (G)(5); *Buhl v City of Oak Park*, 507 Mich 236, 242; 968 NW2d 348 (2021).

## III. ANALYSIS

Plaintiff first alleges that the trial court erred in failing to find a genuine issue of material fact addressing a causal connection between plaintiff's protected activity and the alleged workplace retaliation. We disagree.

"The WPA was first enacted by the Michigan Legislature in 1980 to provide protection to employees who report a violation or a suspected violation of state, local or federal law." *Whitman v City of Burton*, 493 Mich 303, 312; 831 NW2d 223 (2012), vacated in part by 497 Mich 896 (2014) (quotation marks omitted).[8] The WPA advances this protection by removing barriers that may interfere with employee endeavors to report those violations or suspected violations to allow "a cause of action for an employee who has suffered an adverse employment action for reporting or being about to report a violation or suspected violation of the law." *Id*. Because the WPA is a remedial statute, it is to be liberally construed to favor the persons the Legislature intended to benefit, specifically, those employees engaged in protected activity. *Chandler v Dowell Schlumberger Inc*, 456 Mich 395, 406; 572 NW2d 210 (1998).

MCL 15.362 of the WPA provides:

An employer shall not discharge, threaten, or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of

---

[8] In *Whitman*, the plaintiff was appointed police chief for nearly five years when the codefendant mayor declined to reappoint him. The plaintiff filed a WPA claim. He alleged his complaints to the mayor and city attorney, that the failure to pay previously accumulated leave time in violation of a city ordinance, was the basis for adverse employment action. However, the defendants alleged that the plaintiff's dissatisfactory performance served as the ground to decline to reappoint. *Whitman*, 493 Mich at 306-309. Although our Supreme Court concluded that the plaintiff engaged in protected conduct by reporting an ordinance violation to the administration, remand was required to examine whether the plaintiff demonstrated that the adverse employment action occurred because of the plaintiff's protected activity. In so holding, the Court clarified that "a plaintiff's motivation is not relevant to the issue whether a plaintiff has engaged in protected activity and proof of any specific motivation is not a prerequisite to bringing a claim under the WPA." *Id*. at 321. The Supreme Court later clarified that "reports given because the employee is requested to participate in an investigation by a public body are still considered protected activity," and any suggestion in the earlier *Whitman* decision, 493 Mich at 313 was vacated. *Whitman*, 497 Mich at 896. We reject plaintiff's contention that the trial court misunderstood the holding and import of *Whitman*.

this state, a political subdivision of this state, or the United States to a public body,[9] unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action.

"To establish a prima facie case under MCL 15.362, a plaintiff must show that (1) the plaintiff was engaged in protected activity as defined by the act, (2) the plaintiff was discharged or discriminated against, and (3) a causal connection exists between the protected activity and the discharge or adverse employment action." *Pace v Edel-Harrelson*, 499 Mich 1, 6; 878 NW2d 784 (2016).

Under the WPA, protected activity consists of "(1) reporting to a public body a violation of a law, regulation, or rule; (2) being about to report such a violation to a public body; or (3) being asked by a public body to participate in an investigation." MCL 15.362; *Chandler*, 456 Mich at 399.[10] "[A] plaintiff need not necessarily report an actual violation of a law to receive protection under this provision, as MCL 15.362 explicitly provides protection for a suspected violation of a law." *Pace*, 499 Mich at 7. However, an employee with a good faith and reasonable belief that a violation of law is being actively *planned* does not invoke the protections of the act. Rather, the text of MCL 15.362 that references "a violation or a suspected violation of a law" plainly envisions an act or conduct that has actually occurred or is ongoing. *Id.* at 7-8.

In *McNeill-Marks v Midmichigan Med Center-Gratiot*, 316 Mich App 1, 17-18; 891 NW2d 528 (2016), this Court delineated the burden of proof and evidentiary requirements for purposes of the WPA:

> To establish a prima facie case, a plaintiff can rely on either direct evidence of retaliation or indirect evidence. Direct evidence is evidence that, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions. If the plaintiff establishes a prima facie case, a presumption of retaliation arises, which the employer can rebut by offering a legitimate reason for its action. To avoid summary disposition after the employer offers such a reason, the plaintiff must show that a reasonable fact-finder could still conclude that the plaintiff's protective activity was a motivating factor for the

---

[9] The parties do not dispute the definition of the term "employer," MCL 15.361(b), and the definition of the term "employee," MCL 15.361(a). The parties also do not contest the definition of the phrase "public body," which includes a township, MCL 15.361(d)(iii), as well as a law enforcement agency, MCL 15.361(d)(v). For purposes of the WPA, the parties do not challenge the relationship between the parties as employee and employer and that the employer is a public body under the statute. Therefore, we do not address it.

[10] An employee raising the second type of claim, an "about to report" claim, "shall show by clear and convincing evidence that he or she . . . was about to report verbally or in writing, a violation or a suspected violation of a law of this state, a political subdivision of this state, or the United States to a public body." MCL 15.363(4); see also *Chandler*, 456 Mich at 400.

employer's adverse action, i.e., that the employer's articulated legitimate reason was a pretext disguising unlawful animus.

A plaintiff can establish that a defendant's articulated legitimate reasons are pretexts (1) by showing the reasons had no basis in fact, (2) if they have a basis in fact, by showing that they were not the actual factors motivating the decision, or (3) if they were factors, by showing that they were jointly insufficient to justify the decision.

The germane inquiry is whether the employer was motivated by retaliatory animus, not whether the employer is wise, shrewd, prudent, or competent. [Citations, punctuation, quotations omitted.]

Plaintiff contends that the trial court erred in failing to conclude that there were genuine issues of material fact of a causal connection between plaintiff's protected activity and defendants' adverse employment action. The causal connection requirement was addressed by this Court in *Roberson v Occupational Health Ctrs*, 220 Mich App 322, 324; 559 NW2d 86 (1996). The *Roberson* plaintiff, an employee of the defendant was hired on November 22, 1993, and worked in the Dearborn office. The plaintiff and other employees complained of the office conditions that included rodent and insect infestations, leaky ceilings, and sewer backups among other problems. On November 29 and December 9, 1993, the plaintiff complained about the office conditions on a standard health department form. On January 12, 1994, the plaintiff was terminated purportedly because of tardiness and absenteeism. In the two-count complaint, the plaintiff raised a violation of the WPA. The defendants moved for summary disposition of the WPA count, contending that the plaintiff could not demonstrate a causal connection between the protected activity and the discharge. The trial court agreed and granted the motion on this ground. *Id*. at 324-325.

This Court held that the employer was entitled to objective notice of a report or a threat to report by the whistleblower. *Id*. at 326. The plaintiff, in her deposition, testified that she apprised a manager of her *intent* to call Occupational Safety and Health Administration (OSHA) about the conditions, not that an actual call was placed, and that an OSHA employee came to the premises because a man appeared with a badge. This Court concluded that objective notice of a report or a threat to report was not presented and that the plaintiff failed to demonstrate a causal connection between her protected conduct and her discharge. *Id*. at 326-329. Specifically, this Court noted that the actual deposition testimony did not indicate that the plaintiff apprised a manager of a reported violation, but rather, an intent to report a violation. Further, the letter submitted to the health department apparently did not result in a building inspection, contrary to the plaintiff's assertion. Rather, the documentary evidence established that the plaintiff received a response dated January 11, 1994, to the standard form complaint that there was a backlog of complaints and that her complaint would addressed by sending a letter to the employer. Thus, the defendants' documentary evidence demonstrated that an investigation of the premises did not occur before the plaintiff's January 12, 1994 termination. *Id*. at 328-329. This Court concluded that the trial court appropriately granted summary disposition to the defendants in the absence of the creation of a genuine issue of material fact.

In this case, plaintiff claimed that he engaged in protected activity and that there was a causal connection between that activity and his adverse employment action, the two-day

suspension. Specifically, he contended that he reported a violation of law, rule, or regulation by advising his superiors and anyone that would listen that Cleaves was being framed. Additionally, he asserted that he participated in the investigation with Lindsey, the prosecutor, and sent her an e-mail that angered his superiors. In temporal proximity to plaintiff's conduct and actions, he was disciplined. Plaintiff submits that he satisfied the causal connection requirement of a WPA claim.

Plaintiff fails to acknowledge that the internal investigation was precipitated by the citizen complaints from the complainant's mother. The complainant's mother was upset that the complainant reported an assault, but the alleged offender was given a ride home by Johnson while the complainant was left in a motel room with two strangers. Plaintiff did not prepare a police report of the incident even though he had received a suspension in 2002 for failing to take a report of the erroneous 911 call of a bank robbery because a fellow officer was involved.

Clolinger was assigned the task of investigating the citizen complaints. In the course of his inquiry, he concluded that plaintiff failed to comply with rules and procedures (failing to take the report), engaged in conduct unbecoming an officer (his treatment and comments to the complainant, her mother, and the SANE nurse), and failed to investigate (failing to investigate Cleaves OWI, interview witnesses, and secure the videotape). Both Clolinger and Guigear noted that there was a difference between the probable cause necessary to arrest a defendant and the proofs required at trial. Moreover, the decision that probable cause existed to arrest was different than the prosecutor's determination to charge an individual with a crime. Indeed, plaintiff admitted that as an attorney he knew that charging decisions were the province of the prosecutor. Furthermore, Clolinger noted that plaintiff and Johnson should have been suspicious that the complainant purportedly engaged in consensual sex with Cleaves; yet, Cleaves drove away without the complainant and she chose to remain with strangers. Clolinger analogized to a domestic situation where both participants indicated that nothing transpired, but there was evidence of injury.

In the present case, defendants articulated a legitimate reason for the two-day suspension that did not arise from any alleged protected activity. Specifically, plaintiff received notice of a 911 call of a woman running and screaming from a man in a motel parking lot, and the man dragged her back into the room. This occurred on two occasions. On the second occasion, eyewitness Dowdall called 911 because the complainant was screaming, "Help me." By the time plaintiff and Johnson arrived in response, Cleaves was in the process of driving away from the scene. Although Cleaves admitted that he was drinking, he refused and was not administered a PBT. Johnson drove Cleaves home. The complainant was left with two strangers in a motel room. Although the complainant may have indicated that consensual sex occurred or that she was not assaulted, plaintiff and Johnson did not question her about the earlier reports of fleeing from Cleaves or find it suspicious that she chose not to leave with Cleaves and remain with strangers instead. Plaintiff and Johnson did not record the names or statements from the two witnesses and did not visit the night shift clerk to determine if videotape of the incident was recorded. Plaintiff had been previously reprimanded for failure to prepare a report which included a lengthy suspension in 2002 for not documenting an officer-involved robbery scare.

Because defendants presented evidence that plaintiff's inaction or negligence in violating departmental rules was the ground for his discipline, the reasons proffered by defendants had a basis in fact, and plaintiff was required to show "that they were not the actual factors motivating

the decision." *McNeill-Marks*, 316 Mich App at 18 (citation omitted). That is, a plaintiff must show that the articulated legitimate reason was a pretext disguising unlawful animus. Plaintiff did not show that defendants' reasons were a pretext to disguise unlawful animus. Plaintiff merely reiterates his same argument, that he voiced concern to his superiors and to anyone who would listen that Cleaves was being framed, there was no probable cause to arrest anyone at the scene, and that his mandatory participation in the investigation by the prosecution caused his discipline.

However, when asked to present evidence that Cleaves was "framed," plaintiff cited to Detective Neering's request that officers and dispatchers recall any prior incidents involving Cleaves or to apprise Neering if Cleaves' vehicle was seen in proximity to a motel. Neering's request for information related to Cleaves does not constitute evidence of being "framed." Indeed, this case presented a credibility contest between the complainant and Cleaves regarding what transpired in a motel room shared by them. The eyewitness accounts as well as the videotape presented circumstantial evidence to buttress the complainant's claims. Furthermore, Neering's investigation and interviews of other people led to the discovery of an additional female that was present at the motel room with Cleaves earlier that same evening. Thus, Detective Neering's attempt to discern if there were other accusations against Cleaves does not rise to the level of framing, but demonstrates an investigation to learn if there were other complainants or possible other-acts evidence. Although plaintiff alleged that he was disciplined and not promoted because of his view of the Cleaves case and his attempt to prevent a framing, plaintiff expressed and advocated for a position that he readily admitted was not his role as a police officer, but the responsibility of the prosecutor. That is, plaintiff acknowledged that there was a distinction between the role of the police and the prosecutor and that the prosecutor was responsible for charging an individual with a crime. Additionally, plaintiff admitted that he could not identify any acts of fabrication by defendants. And plaintiff failed to dispute that he violated police department rules and procedures including failing to prepare a report and failing to document the names and statements of the witnesses. Under the circumstances, plaintiff failed to rebut defendants' legitimate reason and demonstrate that the reason proffered was merely a pretext disguising unlawful animus. Accordingly, the trial court did not err in granting summary disposition by concluding that plaintiff failed to demonstrate a causal connection between protected activity and the adverse employment action of a two-day suspension.

Next, plaintiff alleges that the trial court erred in holding that plaintiff's e-mail communication and participation in the Wayne County Prosecutor's Office investigation "was not protected activity" under the WPA. We disagree.

At the hearing on the motion for summary disposition, the trial court declined to rule on the question of protected activity. Specifically, the trial court determined that it did not have to decide the issue, but would *assume that plaintiff engaged in protected activity in order to address causal connection*. Although the trial court deemed plaintiff's e-mail to Lindsey as insufficient to constitute protected activity, it questioned whether plaintiff's communications to his superiors could satisfy the requirement. Ultimately, the trial court determined it would assume that the protected activity requirement was satisfied to proceed to find that there was no causal connection between any protected activity and the adverse employment action in light of the legitimate reason for the two-day suspension, poor work performance. Thus, plaintiff failed to identify the factual support underlying this claim of error. See *Derderian v Genesys Health Care Sys*, 263 Mich App 364, 388; 689 NW2d 45 (2004). Rather, plaintiff requests this Court reverse the trial court for a

holding that it did not render.  Accordingly, this claim of error does not entitle plaintiff to appellate relief.

Affirmed.  Defendants, having prevailed, may tax costs.

/s/ Anica Letica
/s/ Jane E. Markey
/s/ Colleen A. O'Brien